Case No. 18-7059. Himit Mawakana, Appellate v. Board of Trustees of the University of the District of Columbia. Mr. Saltzman for the Appellate, Mr. Rogers for the Appellate. Good morning and may it please the Court, I'm Richard Saltzman on behalf of Himit Mawakana. Time and again, this Court has cautioned the District Courts not to usurp the role of the jury on summary judgment, particularly in civil rights cases where the issues of motive and intent predominate. In this case, each side had a story to tell, backed by competent evidence. There was plenty of evidence on the plaintiff's side for a reasonable jury to find that African American professors faced a more onerous standard when they were seeking tenure or promotion than their white peers. Six black professors at UDC law schools attested to their own circumstances and their belief that they faced discrimination based on race at UDC law school. Himit Mawakana was the third black professor in a row denied tenure and forced to leave the law school. In the few years surrounding his application for tenure, eight professors applied. All three of the black professors were denied, all five of the white professors granted. Looking at the particular qualifications of some of the people involved, UDC had just promoted a white professor, who we have identified as Comparator 3, who had not published a single traditional law school article, journal article, and who one member of the subcommittee described as having very weak scholarship. Himit Mawakana, in contrast, had published four articles, three in traditional law school journals, two of them nominated for significant awards. These facts led one member of the subcommittee to concede we as a whole treated the white guy better. This committee voted, notwithstanding those misgivings, voted unanimously against, and the faculty voted unanimously all but one abstention and one in favor. They voted against. So how can we find, notwithstanding the dissatisfaction that is expressed, the concerns and dismay about this pattern, how can we find that the decision itself, the action that's challenged, was discriminatory? There's no doubt, Judge, that that is one of the facts that UDC trumpets in their favor, and that should be a jury question. The answer to your question is that there was considerable evidence of tampering by the dean that had an impact, including the fact that weeks before the subcommittee even wrote their report, in which they really severely criticized Mr. Mawakana's scholarship, the dean and the FERC chair were emailing each other saying, we've already lined up all of the FERC committee members to vote against Mr. Mawakana, six weeks before they were even to have the meeting in which they were discussing his qualifications. Before that, the dean and the chair of the FERC subcommittee met with Mr. Mawakana in November of 2012 and told him, withdraw your application for tenure and resign from the university or else. So there's plenty of evidence for a jury to find that once the die was cast, and that the dean had made it crystal clear by going to the subcommittee, as she had with virtually every African American professor during this time frame, who sought tenure, and bringing negative information about that professor before any subcommittee meeting, to the subcommittee vote, making it clear that the dean had a point of view which may have influenced the jury. What is the strongest evidence in the record that the point of view was not a merits-based point of view, but was discriminatory? So if you have faculty that you think are not going to successfully clear a tenure hurdle, it seems responsible decanal leadership to try to prevent something that would be a blot on the reputation of the candidate, that would be divisive and agonizing for the school. Say, you know, maybe if you voluntarily went elsewhere or sought to defer this consideration, you know, given the weakness of your application. So the fact of communication, the fact that the communication was early, how do we, other than the numbers, which are striking, how do we, you know, additionally, how do we say it's race and not, and this is a small sample size. So even though the numbers are striking, it's a small sample size. Well, there are several pieces of evidence that we would point to, Judge, and simply to say that the jury should have been allowed to make this call. Well, but the jury should have been allowed to make the call if there's competent evidence of discrimination. Yes. So that's what we want to hear about. So here's the competent evidence. In the tenure decision, they severely criticized Mr. Mawekana's article on power and law. Just a year before, applying the same qualitative standard, the same people, including the dean, determined that that was good quality scholarship. Now, that is the kind of flip-flop. That is a credibility issue where the dean said, well, when we were evaluating him for associate professor and we were looking at this exact same article, we were showing him love. But looking at it for tenure, we found it to be a lousy scholarship. Now, a jury might buy that, and a jury might not buy that. But that is the kind of pretext evidence that courts routinely look at to discredit employers' explanation and infer discrimination. In addition to that, we have the disparate application of standards, always pointing in the same direction. Always pointing in the direction of crediting scholarship for white applicants and discrediting scholarship for black applicants. Crediting related pieces. They would not allow Mr. Mawekana to present a related piece as scholarship, whereas white Comparators 3 and 4, absolutely. Crediting non-academic practice materials. White Comparator 3 was allowed to rely entirely on non-traditional practice materials, whereas African American Professor 7 was told by the dean that she could not. But the practice materials issue doesn't go to this professor. But you're just saying it's part of trying to prove the frame of mind of the dean? That's correct. Crediting co-authored pieces. White Comparator 3 and White Comparator 4, but White Comparator 3 in particular, didn't have a single writing in which he was the sole author. And in all of them, he wasn't even the signatory. But they credited all of that scholarship, but would not credit a co-authored piece for Black Comparator 1. Publishing in the home journal. The dean denigrated scholarship presented by Black Comparator 1, but allowed and saw no red flags when White Comparator 4 had two articles published in his home journal. These are the types of application of standards that a jury can look at and say, they always are used to benefit the white candidates, and they are always used to disfavor the black candidates. And that's the kind of proof that this court has allowed to go to trial consistently. But the district court here felt that she could not engage with any of that evidence. And the reason for that is crystal clear in the record. On page 39 of our brief, we quoted seven, I believe, separate statements by the district court, in which she said that she had to afford great deference to the university, because this is a case involving tenure against a university defendant. There is no support in the law for applying that type of standard. And it tilts the playing field so far in favor of the employer, the university, that unless you have a case in which there is direct evidence of discrimination, which is very rare these days, unless you have that, it is virtually impossible to get past the academic standard that she employed. And there is no other industry in which the employer has this kind of advantage. Imagine the same set of facts against a private law firm in which you had a female associate who was seeking partnership, third in a row denied partnership by the law firm, whereas five males have just made it for partner, and evidence demonstrating that at least she was demonstrably better than one of the males who has recently made it. But the law firm provides any explanation that involves professional judgment, such as, well, I thought he was better at a deposition, or I thought his writing was better. And according to the district court, because the explanation involves some professional judgment, the court is required to defer to it. That is a standard that cannot possibly be met, and it is a standard that is not set forth anywhere, either in Title VII or the D.C. Human Rights Act. To the contrary, Title VII was amended specifically to include claims against educational employers when, and the legislative history in particular, cited to the impact on higher education tenure decisions. But how do we avoid, you know, if the claim is made before a jury that, you know, these standards were applied unequally, related pieces, practice materials, co-authored pieces, home journal, and the witnesses come back and say, well, but when I read this article, I just thought it was unoriginal, it didn't add up, it was making grand claims and it wasn't fulfilling them. And at some level, you're putting before the decision makers to second guess the evaluations of the merits of the scholarship. And that's troubling. Well, I understand that, Judge, but I have two answers to that. I would say, first of all, it's the same standard as is applied in any employment discrimination case, which is if there is evidence upon which a jury can reasonably discredit the explanation. Here, for example, the flip-flop on the Power and Law article, then that is sufficient. I would also point this court to this court's decision in a case called McConnell v. Howard University, which I apologize was not cited in our brief. It is a breach of contract case. It is at 818 F. Second 58. But if I could just read a very brief passage from that, where this court said, we do not understand why university affairs are more deserving of judicial deference than the affairs of any other business or profession. Arguably, there might be matters unique to education on which courts are relatively ill-equipped to pass judgment. However, this is true in many areas of the law, including, for example, technical, scientific, and medical issues. Yet this lack of expertise does not compel courts to defer to the view of one of the parties of such cases. When you defer to the view of one of the parties in the case, in a case involving pretext analysis, that's the end of the case. Let me ask you about another opinion from this court, Brown v. Sessom. It is not a Title VII. It's a 1981. And my first question is, I don't know why, since in that case, we said, we assumed without deciding there was a contract. This very school and one of these very professors, Professor Brown. We said really quite easily that notwithstanding it was a tenured issue and we did not have Title VII in front of us. But from that case, I'm not using the professors who are under this protective order in this case. Frankly, I don't know why there is even a protective order in this case. But going just from the Brown v. Sessom case, you have in 2009 a black female, Professor Brown, who submits a tenure application. Two years later, in 2011, she is denied tenure. In 2010, you have a white male, Mr. McClain, who is given tenure. He has no publications and is awarded tenure. Or according to the Brown opinion, he has a lack of publications. Then we get to the plaintiff here, who submits his tenure application in 2011. It's at roughly the same time that Brown is denied tenure. Nothing happens that I see in the record in 2012. And then finally in early 2013, the plaintiff, who has three publications, all of which are credited, is denied tenure. I don't see how that does not raise an inference of racial discrimination. I could not agree more, Judge. Well, and Brown, I don't know. It's as simple as using the evidence in Brown and the evidence of the plaintiff in this case. I agree, Judge. And we cited Brown. We argued that we, in fact, had added more meat to the bones than was even set forth in the allegations of the complaint in Brown. But I could not agree more. The evidence of disparate treatment is stark, and it should have been sufficient to get to a jury. And the only reason why the district court didn't is because she was applying a doctrine that has never been endorsed by the Supreme Court, never been endorsed by this court, and will result and has resulted in African-American professors and women professors around the country facing hurdles that their white peers for tenure and promotion do not face. Let me ask you. I don't remember, but she didn't cite Pennsylvania v. EEOC, did she? She did not. Did you argue it? I do not recall, Judge. I would have to go back and look at her. I mean, that tells her that even though she thinks her hands are totally tied by the fact that it's tenure, that the Supreme Court has said that's not the case. I agree, Judge. And that's why it was amended in 1972. Right. We certainly argued the amendments to the law. We cited the Cunda case, which UDC incorrectly says did not address liability. In Cunda, too, the Third Circuit said that it is not proper to afford deference either for the liability phase or for the remedial phase to a university employer just because they're a university, and cited to the law and the legislative history, we cited that. And I do agree, although even though the University of Pennsylvania was dealing not with summary judgment but with the issue of whether to recognize a special privilege, the reasoning is exactly the same. Where is Mr. Malakana now? He is out of academia. He is living in California. All right. And where is – who is the dean now? I believe Dean Broderick just recently retired. I am not sure about that, and I do not know the name of him. Okay. Thank you. We'll give you some time. Thank you very much. Mr. Waters. Good morning, Your Honors. May it please the Court. For the University District of Columbia, I'm Jason Waters. Professor Malakana's appeal asks this Court to assert the academic judgment of the University District of Columbia, in particular the nearly unanimous decision of its Faculty Evaluation and Retention Committee, its diverse tenure committee. However, federal courts throughout the United States have consistently declined to serve as a supertenure department with respect to universities' academic decisions. The Supreme Court's decision in University of Michigan v. Ewing stated that considerations of profound importance to counsel restrain judicial review of the substance of academic decisions. And just five months ago, this Court in Steele v. Mattis recognized that deference may well be appropriate when the question before the court turns on the merits of academic disagreement. In Steele v. Mattis, this Court cited the Ewing decision. But I thought that opposing counsel said precisely that the decision doesn't turn on the merits of the academic work, but it turns on the presence or not of discrimination. Well, the decision, the adverse decision that was reached in this case related to scholarship and scholarship only. But that's the question. Well... How can we even assess whether it's scholarship and scholarship only if... I mean, I guess I'm not clear how what you're saying squares with University of Pennsylvania v. USC or CUNDA or the position that we shouldn't give universities a different and greater deference than we give any other specialized employment. Well, I'll begin perhaps by describing the process of the tenure review at the University of District of Columbia. As Your Honor is aware, and we stated in our brief, this is a five-layer review. The process begins with the FERC subcommittee, three individuals who... Were well familiar with it. Very well. Then Your Honor is aware that the FERC subcommittee individually reviewed the three accepted pieces of scholarship. Each individually came to the conclusion that they did not meet the standards for tenure. Right, and what we're dealing with here is a record that also shows, and what the plaintiff points to, is the dean's involvement, intimate involvement, way in advance of that committee's vote, a pattern of behavior that they say raises an inference that the dean was operating with bias. And farming out the piece for an external reviewer by one of the three members of the subcommittee to someone and telling her this is someone that the dean is really worried about, this is someone that she doesn't want to see tenured. So the independent review that then is submitted to the subcommittee arguably is tainted. So the question is why shouldn't those issues, those conflicts, go to a jury? I mean, the university might well win, but we're just talking about whether there's an issue for a fact finder. Well, the primary issue that counsel is arguing here is a disagreement about the scholarly merits of this professor's work. That's not what I heard, and I heard that he was taking quite some pains not to do that, but to say we'll take the university at its own word. But when it says this piece is great, and we apply the same standards at pre-tenure promotion and tenure, and then six months later or however much later, this same piece, not great. And when it says, you know, you can't use one piece related to another piece as separate scholarship for the count, and then they do allow that. You know, non-academic practice materials do count. They don't count. Co-authored pieces do count. They don't count. Publication in the home journal does count. It doesn't count. So none of those points that I heard from plaintiff's counsel actually reads the piece and says, eh, this is not as good. I would submit, Your Honor, if you review the briefings in the case and you read from the plaintiff, it fundamentally is the plaintiff's disappointment with the FERC subcommittee's analysis of his scholarly merit and his comparison of that scholarly merit with other comparators. But the critical underlying point that's missing from counsel's argument is whether the comparators are similarly situated for the purposes of allowing this analysis to go forward. And we'd submit to the Court that they are not. One thing that's very important to remember here. Well, certainly Mr. McClain is not, who never wrote anything. Well, Mr. McClain wrote a variety of practice materials. Well, he wrote that we have found in another opinion had a lack of publication. The opinion that Your Honor is referring to is Brown v. Sessoms that I understand, and that opinion was on a motion to dismiss. It was based on the pleadings and not the evidence that was ultimately induced in the case. I would note that with respect to the comparator analysis, as Your Honor is aware, the comparators have to be nearly identical in virtually every aspect of employment to be considered valid and relevant comparators. With respect to Professor Ford, there were no common members of the same FERC subcommittee. So the same individuals who were reviewing Professor Ford's scholarship were not the same individuals that were reviewing Professor Maurekana's. Professor Ford was a prolific scholar, offered five articles for submission. All outside reviews were favorable. He had unanimous FERC support within the Faculty Evaluation and Review Committee, and he had a different provost. Well, are you saying McClain was not a comparator? Professor McClain, Professor Three, we do not submit that he's a proper comparator. He had only one common member of the FERC committee. The other members of his FERC committee were different than Professor Maurekana. So the individuals charged with the responsibility of evaluating the scholarly merit, the teaching, and service of each of the professors, two of three were different in Professor Three's case. Now, he did submit practice materials. The FERC subcommittee evaluated that and gave him credit for those practice materials. The Standards and Procedures Manual for the university makes it clear that it doesn't have to be a law review article that is submitted, that other materials of scholarly merit may be considered. And in the FERC's judgment, it gave an opportunity to consider those materials and considered his contribution to those materials. The outside reviewers for Professor Three were all favorable. And there was a different provost and, again, a different president. The dean was the same. In his case. What's critically important about this particular... And the dean was the same with Professor Brown. With Professor Brown... Because she changed her mind about Professor Brown. Well, Professor Brown... The FERC subcommittee was entirely different for Professor Brown than Professor Maurekana. I'm sorry, Professor Two. Professor Two enjoyed unanimous FERC support, and you're correct. The dean originally suggested that Professor Two withdraw her application because she had not published and met the requirements. But when she did submit... When her third article was accepted for publication, the dean wrote and endorsed in paper, in writing to the provost, her support for Professor Two to receive tenure. It was thereafter that the provost and the president disagreed. I appreciate, and it's helpful to hear your description of the comparators, but I thought the case was, for some of the reasons that you're mentioning, that the committees were different. The case that this plaintiff is making really focuses on the role of the common dean and also on the applicability and, in part, in impugning the neutrality of that dean, the disparate application across a body of tenure cases of these rules. And so in that analysis, to some extent, the comparators, and whether they're similar or not, somewhat drops away, or am I wrong about that? Do you see what I'm saying? I believe the comparator analysis is still critical because, and this is a very important point, the plaintiff concedes, and there is no evidence or allegation, that any individual member of the FERC subcommittee, or the FERC, or, for that matter, individuals above Dean Broderick, acted with any impermissible racial animus. So his burden under McDonnell Douglas is to show that the decision makers in this case did not hold an honest and reasonable belief that the stated legitimate nondiscriminatory reason was, in fact, true. It is not enough to show that there is a disagreement among scholars with respect to his scholarship, and the FERC, like any employer, is entitled to reach its own decisions about, in good faith, legitimate nondiscriminatory substantive criteria for employment, retention, and promotion. So the concern, and I guess if you look at the comparators, and you say these comparators really were stronger, the comeback from the plaintiff is, we have a committee here that maybe voted unanimously against Mr. Malkana, but its senior member was, for months, communicating with the dean, and, you know, the argument, I think, was seeing the writing on the wall and carrying out the dean's bidding, so that when we look at the committee vote as indicative of quality or not, the plaintiff would say, well, you know, you're basically assuming away our case if you credit the committee as having made independent and unbiased determinations. It's not that they're bringing the bias to the table, but more a cat's paw, that they're carrying out. Exactly, and because there is no allegation or evidence that the members of the FERC acted with racial animus, he can only go to cat's paw and only argue that the dean impermissibly influenced the FERC or the subcommittee's decisions. But look at the evidence that they offer in the case in this respect. There are three criteria for tenure at the University District of Columbia that the FERC is required to review. That includes teaching, service, and scholarship. The comments that the dean, that are attributed to the dean with respect to Professor Malakana's application for tenure relate to student concerns, student evaluations with respect to teaching, the questions about the impermissible use of TAs with regard to grading, also teaching, and his service to the university. Cat's paw analysis under Stout requires... What was wrong with his service to the university? It was felt to be weak. His service was involved with faculty athletics. But during his tenure and during his time coming up toward tenure, he was repeatedly advised that he was not on track for publication schedule and that he needed to focus his priority on publication. That was back in 2009. Right, as he was coming up towards his tenure clock was running. But wasn't he also depressed? I'm sorry. That was not until two years later, 2011. This happened along the way. All right, but they were all completed by then. The publications were completed in 2011. But the Cat's paw analysis requires evidence that the dean was acting with racial animus. There's obviously, and counsel concedes this, no direct evidence that anything she did was racially motivated. Cat's paw also needs to show that she is attempting to inject in the decision making that racial animus to affect an adverse outcome, and that it also requires to show a causation element. This is critical here because this FERC subcommittee determined on its own analysis that the scholarship was lacking. The dean's comments about teaching and service were rejected. So when we can look at the fact that there is a concession that none of the subcommittee members acted with racial animus, and that the attempt to influence them, allegedly, wasn't successful, the Cat's paw analysis under Stoud necessarily fails. So just pushing back on that from what I think the plaintiff's counsel would say, the service to the university is a little dicey for the dean, who in fact had pressed Mr. Malakana into service in this athletic role, that then over time she and another senior administrator thought he was overdoing. So there's a little bit of ambiguity in what they're asking him to do. And on scholarship, the concern I think that's raised there is that the evaluation of the scholarship, which in these cases is heavily dependent on external reviewers, that the external reviewers were even tainted by the dean's view, I think it's Professor No. 4, the senior member on the subcommittee, reaching out to the external faculty and saying, basically this is someone that we're really worried about, and that the dean's concern doesn't make the grade. And so the case anyway, and I'm just interested in your best response, is that the scholarship evaluation was tainted. There's no record evidence of that. Anything the dean said with respect to teaching and service was rejected by the FERC subcommittee. Teaching and service, but I'm talking scholarship and the external reviewer. That's what I'm getting at. They rejected the dean's influence with respect to those two categories in the tenure review, but found him lacking on the scholarship. There's no evidence that the dean influenced their evaluation of scholarship, and there's no evidence that the dean essentially acted through an intermediary to obtain an external negative review. What is clear is that the FERC conducted an extensive, detailed analysis, prepared a 36-page, single-spaced report with respect to their criticisms of his scholarship. This was not an area that the dean had weighed in on with regard to this particular application for the purposes of Catsball, and there is no claim by the plaintiff that the FERC subcommittee, which unanimously concluded and is entitled to set standards and to evaluate the subject matter of an applicant's academic submissions, ultimately weighed against. So Catsball doesn't apply. The comparator analysis, I believe, is legally inadequate and not probative, and for all of these reasons, and I've seen that all the time. Let me just ask you, we'll bear with you, to answer whatever questions the panel still has. But my one remaining question is it's concerning that I think it's Professor No. 4 claims to have in February had concerns about February 2012 about his article. I'm sorry, Professor No. 8. Yeah, thank you. Had decided the article he was responsible for reviewing didn't meet tenure standards, and I believe the record shows that it's not until November of that year, when really the process is pretty much coming to a close, that he even raises the concerns with the professor. And we're talking about that spans a summer, which in the world of academia is the time when a faculty member really can spend a significant amount of energy and hours on work. Is that accurate? I know there's this contract playing. I believe, Your Honor, if you look at the record, we've both put forth the evidence record with regard to comments that were made about the professor's scholarship. While there were positive comments about drafts and abstracts or theses, there were repeated comments throughout his time at the University District of whether he was on time for his publications. Professor No. 22 was an external reviewer. It gave early comments with regard to a draft of the Power and Law article. There's zero indication that that professor was in any way influenced by an attitude with respect to Professor Malakana's tenure application. In fact, her comments were made long before the tenure application. And while favorable of the thesis, gave a summary of a variety of different elements that he could do to make the article better. Professor Nein also weighed in with comments that were ultimately partially incorporated, but ultimately not entirely incorporated into the Power and Law article. But it's not only the Power and Law article. The two other articles, the HBCU article as well as Coast Federal, were never submitted to the faculty before they were published and made it into his tenure application. So the question is, if somebody's told early on, this article's great, it meets tenure standards, and that people don't circle back, the concern I have is this notice concern, which is really raised through the contract claim, but it also, I think, dovetails potentially in the way the plaintiff would present it with the discrimination claim, that Professor No. 8 decides the article that he's responsible for reviewing doesn't meet tenure standards. February 2012, I'm looking at JA 190. And then it's not until November of that year, looking at JA 192 and 1178-80, that he expresses concerns directly to the professor. So I'm just worried about this notion that, yes, people are worrying, but they're not communicating in concrete, constructive ways. Here are the things you need to elevate in your scholarship in order to meet the hurdle. We're talking about the Power and Law article. The submission with respect to his promotion to associate professor, it was a draft of the article, it wasn't the final article. He did not submit the Coase Federal article at that time. He did not submit the HBCU article. So regardless of a favorable, at least at that time, impression of the draft of the Power and Law article, the other two articles, which were also found to be seriously lacking in scholarly merit, were not considered as part of that analysis.  on the Power and Law article from Professor Nye and external reviewer Professor 22, long before his tenure application. And during his reviews, there were discussions with regard to his tenure clock and taking advantage of Professor Nye as a mentor for the scholarship issues and to become the prolific scholar and the contributing scholar that the university requires. So in terms of the time gap, you don't really have a senior member on the subcommittee. And whether he, you know, I mean, because it's one thing for, you know, in faculties, people give you feedback on your work all the time. Sometimes it conflicts, sometimes it's not your particular taste or choice. But for somebody who's on a tenure committee and a senior member and himself African-American, to say, this is going to put you in tenure trouble. It seems like it's incumbent on the university, if the guy is in tenure trouble, not just to say, hey, I would do your article differently, or hey, you could strengthen it in this way, but I've read your article, you're in tenure trouble. And the summer coming up, you better get into the library and improve it. And it sounds like that professor reached that conclusion in February, but didn't communicate it to the candidate until November. Of course, during this time, the FERC subcommittee is also reviewing other submissions from this professor as well as other candidates. But I want to bring this back to the burden here. The burden is for the plaintiffs to show that the FERC subcommittee decision, which was nearly unanimously, was not reasonably and honestly held. And the timing of that communication, while we submit that he had been receiving constructive comments and concerns about his scholarly work during this process, doesn't bear on that ultimate question in our view as to whether the FERC subcommittee honestly believed the merits of the scholastic merit of the work that was submitted to them for tenure. And in terms of deference, are you asking for deference? I read your brief to say no. You're not asking for special deference for universities. No. I disagree with counsel's argument that Judge Berman Jackson applied the incorrect standard. Okay. And you don't think the correct standard includes any special heightened deference for universities? That wouldn't apply to other – I'm sorry. I'm sorry. We're not taking the position that it's special or heightened in the sense that it creates an additional burden. The courts have discussed in Zahork, in particular, the reasons why courts do not interfere with genuine academic decision-making. And I think it's fair to say this court, in Dictum in the Steele v. Mattis case, indicated that deference – I think the quote is, deference may well be appropriate when the question turns on genuine academic disagreement or substantive qualifications for a position. And in that statement, the court cited University of Michigan v. Ewing, Horowitz v. University of Missouri, the Zahork case from the Second Circuit, the same cases that we're talking about with respect to all the reasons why courts do not interfere with substantive decision-making, also alluding to what Your Honor said before with regard to, inevitably, this case, the precedential value of this case, it invites courts and juries to second-guess the subject matter expertise of the tenured faculty members who are charged with this responsibility. This case is accessible to us because he's a lawyer, and some of us in the room are tenured professors. The next case could be a quantum physics professor or a professor of 18th century Russian literature, asking the jury to assess credibility based on their ability to digest that subject matter expertise and also to understand the doctrinal differences within the specialties and the longstanding disputes among professionals in that field. The next person could be a CPA, could be a construction worker, could be a glass roller, a lot of things that we don't particularly understand. So I understand that we do not sit as a super-personnel committee, and I understand and appreciate that's not our role and that it's quite a delicate task to stay away from that. Thank you, Your Honor. Wait, I have several questions. All right, first, does a subcommittee renew more than one tenure applicant? A subcommittee is assigned. Three individuals, they're not always the same individuals for each candidate. If there are two candidates, the three subcommittee members may be different for each candidate from the other. That's why we recognize the importance of the similarity of the decision-makers here. I understand that. I was trying to find out if the subcommittee for the plaintiff reviewed anyone else at the same time. I can't answer that on this record, Your Honor. All right. Do you know whether – first of all, I want to ask you, nobody's mentioned this e-mail to Dean Broderick, who asks one member to speed things up, and she says, I will, but in view of the loss of four faculty members, all of them people of color, in the last four months or whatever, I'm not going to clean house for her, something like that. What's your position on that? Well, I think the comments and opinions that are referenced here are largely immaterial and not probative of the actual issue that's in this case. The actual issue in this case, the protection issue in this case, is whether the decision of the FERC and the subcommittee and their assessment of Professor Malacana's scholarship was not reasonably held. He's quite specific about the analysis. Let me ask you again about Mr. McClain, who is, I understand, deceased, so I don't think we have to worry about this protective order. But he's the one discussed in Brown versus Sessoms, because we went into the record and found that he submitted, in his lack of publications, he submitted a brief as one, and then a Maryland Law Journal article about that, which is not supposed to count as related material unless so-and-so, so-and-so. So they counted both of those, apparently. Yes. He did not have a third, and he was, according to the Brown opinion, he was, and that was quoting Professor Brown's complaint, so that's, we don't know, but that he was awarded all sorts of credit for service. And my question to you is, is there anything in the record about any of these professors that they overlooked the scholarship or even overlooked the teaching because of service? Or is that just Mr. McClain? I'm not aware of anything that fits that precise question, Your Honor, in the record with respect to that. What I do know with regard to Professor McClain is he was well regarded in the field of DNA analysis, that the FERC Committee, in its judgment, decided to give him credit for scholarly equivalence, practice material equivalence, which under the Standards and Procedures Manual for the University District of Columbia, they are entitled to do. Okay, and then finally, Dean Broderick was dean for 20 years. That's right. Do you know if that's usual in law school deans? I mean, this is off the record, but that's an unusually long time, I think, for a tenure. I can't say. I'm familiar with my own law school and by virtue of this representation, Dean Broderick, but I know that Dean Broderick was recognized for her service to the university, and that during her tenure, the university was recognized as one of the best, most diverse tenured faculty and one of the best for minority students. All right. Thank you. All right.  Thank you, Judge. Thank you. Your Honors, I would point the Court to Joint Appendix, page 397. It is Dean Broderick's report on Mr. Mamakana to the Provost, which I think establishes, a jury could see, that she does taint and influence the process both above and below her. Rather than just informing the Provost that the FERC found that Mr. Mamakana's scholarship did not meet, but that teaching and service did meet, she reports to the Provost that she would have found and did find that he didn't make it in anything and then became very critical of his service and his judgment in taking on the athletic representative role and talking about the teaching. A jury could look at this and say, this is somebody who is attempting to influence the process, not just reporting to the Provost what the FERC found. All of the facts that defense counsel talked about would make a perfectly fine closing argument to the jury. But that's the point. There was sufficient evidence for a jury to see this either way. And the District Court clearly applied heightened deference. That is painfully obvious from the quotes on page 39 of our brief. Two of them, I'll just read quickly. The Court is required to accord great deference to an educational institution when it undertakes a review of an academic determination. And a court may not overturn an academic decision unless it is such a substantial departure from an accepted academic norm as to demonstrate that the person or committee responsible did not actually exercise professional judgment. That's not a standard that's applied to any other industry. And it shouldn't have been applied here. This Court did not have to address the issue in Mattis v. Steele because that did not, the employment action at issue did not involve arguably academic judgment. If this Court is going to address the issue here, it should hold clearly and unmistakably that educational institutions are subject to the same standards and the same burdens of proving pretext as any other employer. All right, thank you.
judges: Henderson, Rogers, Pillard